UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARTREESE SMITH, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    No. 3:21-cv-00833 |
| | ) |
| ADEBCO, INC., | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court is Defendant ADEBCO, Inc.'s Motion for Summary Judgment (Doc. No. 35). The Motion has been fully briefed. (Doc. Nos. 39, 42). For the following reasons the Court will grant ADEBCO's Motion (Doc. No. 35).

### I.    UNDISPUTED FACTS AND BACKGROUND[1]

Marteese Smith had driven dump trucks for ADEBCO for four months when, on November 5, 2019, he attempted to empty his truck bed on sloping ground and caused the truck, valued at about $200,000, to roll onto its side. (Doc. No. 39-6 ¶ 1). The incident totaled the vehicle and left Smith with several injuries, including lacerations to his left hand. (Id. ¶¶ 1, 20). Within twenty minutes of the incident, police arrived on the scene and interviewed Smith. (Doc. No. 38-3 at 2, 5). The police report generated matches this brief narrative, (see id. at 5 ("[Smith] was a dump truck driver moving rocks at the quarry . . . [and] was in the process of unloading a load of rocks. [Smith] stated he believes he may [have] been on uneven ground, and his vehicle tipped over to its left side.")), as does the short statement that Smith authored the following day.

---

[1] The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statement of facts (Doc. No. 39-6), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.

(See Doc. No. 37-2 at 21 ("On [November 5, 20]19, as I began to back up the hill, I was talking to my wife on the phone. Before I began to dump, I told my wife I had to call her back. I backed up, pulled my air brake, and proceeded to lift up my bed. I then kept my foot on the breaks and continued to lift up my bed all the way up and ease my foot off the breaks. My truck began to tilt over. I unsnapped my seat belt and climbed out and called my supervisor for help.")).

The day after the incident, ADEBCO also issued its own report. Though less than a page, this report is the most fulsome description of what occurred. In the report, Smith's supervisor wrote:

> Marteese was loaded with rubble and had backed up to unload in front of other piles of rubble that other drivers had unloaded during the day. He then put his truck in neutral with his foot on the brake to keep his truck from moving forward. Marteese explained that he lifted his bed all the way up to unload. While unloading, he said he would let off the brake from time to time to allow the truck to move forward as he dumped.
>
> While still unloading Marteese believes that the ground gave out and this resulted in the truck flipping onto its side.
>
> After Marteese had flipped, he said he was worried about being stuck in the truck and therefore climbed out of the truck from the passenger door.
>
> Marteese then called me and explained his injuries to include a knot on his head, cuts to his left hand, and a scratched and swollen elbow. He stated that he had his seatbelt on and was using the truck's blue tooth device to talk on the phone while he was unloading.
>
> Shortly thereafter, another driver arrived at the scene and called an ambulance.
>
> Upon my arrival, it appeared the ground where Marteese was dumping was not completely level. In addition, I believe the load may have shifted inside the bed as he continued to dump, and because he moved forward while dumping, it caused the truck to tip over.

(Doc. No. 39-4 at 2). Based on this, ADEBCO determined that Smith was fully responsible for the incident. (Doc. No. 39-6 ¶ 13).

ADEBCO also determined that Smith's actions violated two supposed safety policies. (Doc. No. 39-6 ¶ 8). The first policy was ADEBCO's policy restricting cell phone use at the jobsite. (Id.). Specifically, the policy, which Smith acknowledged and agreed to, provides that "[a]bsolutely no cell phones are to be used while on the jobsite." (Id.). The second was not necessarily a policy, but rather a "safety goal" for drivers to "get out and look at what's around our trucks from time to time during backing situations." (Id. ¶ 10).

Within a few days of issuing its one-page investigation report, ADEBCO decided to terminate Smith's employment. (Doc. No. 39-6 ¶ 13). However, when the decision was made, Smith had already started receiving workers' compensation for his injuries. (See id. ¶ 20 (stating that Smith received workers' compensation on November 6, 2019); see also Doc. No. 39 at 21 (conceding that the decision to terminate Smith was made on November 15, 2019)). Only after Smith's workers' compensation claim had concluded did ADEBCO inform him that, months prior, it had decided to terminate his employment. (Doc. No. 39-6 ¶¶ 20–21; see also Doc. No. 18 ¶ 17 ("On January 9, 2020, an ADEBCO employee informed Plaintiff he was terminated . . .")).

On August 27, 2020, Smith filed a charge of discrimination with the Tennessee Human Rights Commission and the U.S. Equal Employment Opportunity Commission (the "EEOC"). (Doc. No. 19-1). After receiving notice of his right to sue, on November 3, 2021, Smith filed the instant action, claiming that he was discriminated against based on his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq* (the "THRA"). (See generally Doc. No. 1). Roughly three months later, Smith

3

amended his complaint, adding an additional claim under Tennessee common law for retaliatory discharge. (See generally Doc. No. 18).

To support his discrimination claims, Smith identified two white ADEBCO truck drivers who were involved in accidents and not fired, Phillip Battles and James Osborne. (Doc. Nos. 39 at 5; 39-2 ¶ 8). The first, Battles, failed to lower his truck bed after dumping concrete while working on a project on I-85 in Spartanburg, South Carolina, and, when he attempted to drive away, struck an overhead bridge. (Doc. No. 39-6 ¶ 16). Though there is no record evidence of any damage to the bridge, the collision knocked the bed from Battles' truck, (id.), which cost ADEBCO approximately $25,000 to repair and reinstall. (Id. ¶ 18). According to ADEBCO, a spotter employed by another contractor was partially responsible because the spotter's task was to hold trucks until their beds were completely lowered and, in emergency situations, sound an airhorn to alert the drivers and have them stop. (Id. ¶ 17). In this instance, the spotter did neither. (Id.).

The second comparator, James Osborne, worked on the I-440 project and was involved in two incidents. (Doc. No. 39-2 ¶ 5). The first took place on April 25, 2019, when Osborne drove over a pile of rubble and damaged his truck's air tank, step, and battery box, causing $8,000 worth of damage in repairs. (Id.). The second occurred on July 18, 2019, when Osborne forgot to lower his truck bed and caught a number of low-hanging utility wires. (Id.). His truck was not damaged. (Id.).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court

of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

### III. ANALYSIS

#### A. Smith's Discrimination Claims

When a plaintiff brings a discrimination claim under Title VII, the THRA, or Section 1981 and relies on circumstantial evidence, as Smith does here, his claim must be evaluated in accordance with the framework enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See generally Wright v. Murray Guard, Inc., 455 F.3d 706 (6th Cir. 2006); see also Baily v. USF Holland, Inc., 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis brought pursuant to the THRA is identical to the analysis used for Title VII claims."); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992) ("The McDonnell Douglas/Burdine formula is an evidentiary framework applicable not only to claims brought under Title VII, but also . . . to

claims of under 42 U.S.C. § 1981."). Under the three-step burden-shifting framework for analyzing claims of employment discrimination, a plaintiff must first set forth a prima facia case of discrimination. Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001). If the plaintiff does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. Id. The plaintiff must then demonstrate that the reasons offered by the employer were pretext for discrimination. Id.

To establish a prima facie case of discrimination, Smith must show that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). ADEBCO does not contest that Smith has satisfied the first three elements of a prima facie case, (Doc. No. 36 at 13), and Smith does not claim that he was replaced by someone outside of his protected class. (See generally Doc. No. 39 at 5–19). What's more, there is no dispute over whether the identified comparators—who both kept their jobs—received different treatment than did Smith. (Doc. No 39-2 at ¶ 8). Thus, Smith's prima facie case hinges on whether sufficient evidence exists to establish that either Battles or Osborne is a valid comparator.

To do so, Smith must show that the identified comparators are similarly situated in all relevant respects. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); see also Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016). This does not require the comparators to "be identical in every way." Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 304 (6th Cir. 2016); see also Nolan v. Ohio Dep't of Rehabilitation & Correction, No. 21-4213, 2022 WL 17759905, at *5 (6th Cir. Dec. 18, 2022) (same). The Sixth Circuit has noted

6

three relevant inquires are whether the two employees: "'(1) dealt with the same supervisor; (2) have been subject to the same standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). This last aspect includes, but is not limited to, an inquiry into whether the two employee's actions were of comparable seriousness. Johnson v. Ohio Dep't of Public Safety, 942 F.3d 329, 331 (6th Cir. 2019). However, at bottom, the Court "must make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee' based on the facts of the case." Tennial, 840 F.3d at 304.

To challenge Smith's assertion that either Battles or Osborne is a valid comparator, ADEBCO forgoes any discussion of the first two aspects, and instead points to a handful of differences between their incidents and the one that led to Smith's termination.[2]

Beginning with Battles, ADEBCO argues that his incident involved mitigating circumstances sufficient to distinguish his conduct from Smith's. (Doc. No. 36 at 14). Specifically, ADEBCO highlights that its investigation into Battles' incident revealed that Battles shared responsibility with a spotter who distracted him, failed to hold Battles' truck until its bed had fully lowered, and did not sound his airhorn before Battles collided with the bridge.

---

[2] Although ADEBCO's opening brief only addresses Battles, (see Doc. No. 36 at 5–6), the Court must still determine whether Osborne is a valid comparator. If through the record evidence Smith cannot establish a prima facie case, the Court cannot allow him to proceed to trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (holding that where a nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," a court should enter summary judgment in favor of the moving party.). Here, ADEBCO submitted additional exhibits with its reply brief. (Doc. Nos. 42-1, 42-2, 42-3). But the Court did not consider those papers, (infra Part I), and formed its conclusions based on the record evidence properly before it.

7

Case 3:21-cv-00833   Document 46   Filed 09/11/23   Page 7 of 11 PageID #: 370

(Doc. No. 36 at 14). What's more, the investigation found no evidence that Battles violated ADEBCO's phone policy or "get out and look" safety goal.[3] (Id.). ADEBCO also underscores the difference in the severity of the damages, comparing the roughly $25,000 in repairs that Battles' incident caused with the total value of the truck Smith totaled. (Id. at 14).

Smith pushes back, arguing that he and Battles are similarly situated because both men "were deemed at fault in accidents that caused significant damage" to ADEBCO's trucks. (Doc. No. 39 at 4). In doing so, Smith concedes, as part of analyzing the third criterion, "courts should look to whether the comparators' actions were of comparable seriousness to the conduct for which [the plaintiff] was discharged." (Doc. No. 39 at 4 (internal quotations marks and citation omitted)). To Smith, this process is simple; he contends that "both were serious accidents that had potential but luckily failed to cause serious bodily harm to the drivers or others, and both caused significant damages to the dump trucks." (Doc. No. 39 at 4). But, in doing so, Smith paints with too broad of a brush. As the Sixth Circuit has made clear, "[w]hen it comes to comparable seriousness, it is the particular conduct of the [individuals], not broad generalizations that count." Johnson, 942 F.3d at 331. The undisputed record evidence demonstrates that the damages caused by Smith's accident were an order of magnitude larger than those caused by Battles. Battles caused roughly $25,000 in repairs. (Doc. No. 39-6 ¶ 18). Although that sum is not trivial, Smith totaled the $200,000 truck ADEBCO entrusted him with. (Id. ¶ 1). Merely calling both incidents "serious" or "significant" fails to account for this stark discrepancy.

Smith attempts to deflect this point by arguing that the Court should disregard the price tag of the totaled truck and only consider the sum that ADEBCO paid after insurance. (Doc. No.

---

[3] These sorts of mitigating circumstances, however, may be better left until the third step in the burden-shifting framework. See Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011) ("One common misapplication is the tendency to push all of the evidence into the prima facie stage and ignore the purpose for and application of the three stages.").

39 at 4).  However, this is a red herring.  No authority identified by Smith or this Court suggests, let alone mandates, that the "comparable seriousness" determination should be based upon the accident's adverse economic effect on the company's bottom line.  And, even if the Court truncated its role to Smith's benefit, the value he proposes is flatly wrong, and does not account for the total financial harm his accident caused ADEBCO.  (Compare Doc. No. 39-3 ¶ 10 ("The truck driven by Plaintiff was a total loss as a result of the accident.  ADEBCO's insurance carrier paid off the balance of the lien and ADEBCO received $1,200.27.  Although ADEBCO suffered losses as a result of the truck being totaled, ADEBCO is not making a claim against Plaintiff for any losses"); with Doc. No. 39 at 4 ("Defendant fails to disclose that the truck damage was covered by insurance and the total amount that Defendant ADEBCO had to pay was only $1200.27")).  The Court need not spend time further unpacking an argument untethered from both facts and law.

At bottom, one driver totaled his vehicle, and the other did not.  This is a material difference.  This alone distinguishes their conduct and renders Smith and Battles not similarly situated.  In any case, the fiscal impact of each incident only underscores this point.

The same goes for Osborne.  Though Osborne was involved in two incidents, they are clearly different.  With regard to the first, Osborne accidently drove over rubble, and the damage to his truck was even smaller in comparison—amounting to only $8,000 in repairs.  (Doc. No. 39-2 ¶ 8).  The second collision caused no damage at all to any ADEBCO property and was only possible because the utility wires were hanging more than four feet lower than intended.  (Id.).  These incidents are far afield from the one at issue, where Smith accidentally totaled ADEBCO's $200,000 truck.

The Court need not go further. Because Smith has failed to establish his prima facie case, the burden does not shift to ADEBCO. Harris v. City of Akron, Ohio, 836 Fed. App'x 415, 419 (6th Cir. 2020). Smith's racial discrimination claims will be dismissed.

B. Smith's Retaliatory Discharge Claim

In his Amended Complaint, Smith also brought a Tennessee common law retaliatory discharge claim. (Doc. No. 18). As with his other claims, here, Smith relies on circumstantial evidence, and, as such, must operate in a burden-shifting framework like that described above. See Williams v. City of Burns, 465 S.W.3d 96, 112 (Tenn. 2015) (explicitly invoking the McDonnell Douglas framework in a Tennessee common law retaliatory discharge claim). To establish a prima facie case for workers' compensation retaliatory discharge, a plaintiff must show that: "(1) the plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." Yardley v. Hospital Housekeeping Sys., LLC., 470 S.W.3d 800, 805 (Tenn. 2015).

As Smith admits, he "must present some proof other than merely the facts showing his employment, his exercise of rights under the Workers' Compensation Law, and his subsequent discharge" to demonstrate the fourth element, causation. (Doc. No. 39 at 19 (citing Reed v. Alamo Rent-A-Car, 4 S.W.3d 677 (Tenn. Ct. App. 1999))). "Evidence of a causal relationship may be direct or circumstantial, such as 'failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees . . . or evidence tending to show that the stated reason for discharge was false.'" Elllis v. Buzzi Unicem USA, 293 F.

App'x 365, 368 (6th Cir. 2008) (quoting Newcomb v. Kohler Co., 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006)). Another kind of circumstantial evidence Tennessee courts have consistently credited is temporal proximity between the workers' compensation claim and the employee's termination. See, e.g., Conatser v. Clarksville Coca-Cola Bottling Co., 920 S.W.2d 646, 648 (Tenn. 1995). However, these courts have just as consistently held that temporal proximity cannot, on its own, establish causation. Young v. United Parcel Service, Inc., 992 F. Supp. 2d 817, 832 (M.D. Tenn. Jan. 16, 2014); see also id. ("While not alone sufficient . . . temporal proximity plus other circumstantial evidence of causation can present a prima facie case for retaliation under Tennessee law") (citing Mason v. Seaton, 942 S.W.2d 470, 473 (Tenn. 1997)).

Despite this clear requirement, Smith relies only on temporal proximity to demonstrate the causal relationship. (See Doc. No. 39 at 21 ("Here, Smith received worker[s'] compensation benefits on November 6, 2019. ADEBCO was aware of his receipt of the benefits. Smith was terminated on November 15, 2019. This very close temporal proximity (of only nine days) is certainly circumstantial evidence of causation.")). Though the period between his workers' compensation claim and the decision to terminate Smith was remarkably short, as a matter of law, that evidence alone will not suffice. Young, 992 F. Supp. 2d at 832. Without more, Smith has not established a prima facie case, and his retaliatory discharge claim cannot survive.

### IV. CONCLUSION

For the foregoing reasons, ADEBCO's Motion for Summary Judgment (Doc. No. 35) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE